We will now hear argument in Brown v. Farwell. Counsel for the appellant? May it please the Court, Counsel, my name is Robert Wheelan. I'm a senior deputy attorney general employed by the Office of the Attorney General of the State of Nevada, and I have the privilege of representing the appellants in this particular matter. It is our contention that the Federal District Court in this case improperly and incorrectly granted federal habeas relief. It is our request that this Court also reverse the grant of the writ and set this back to the Court with instructions to the Court to deny the writ. As ground one of the federal habeas petition that the Court considered, there was a claim of insufficiency of the evidence. Now, this case is governed by the Anti-Terrorism and Effective Death Penalty Act, and specifically, relief is to be determined based on exhausted claims under 2254d. Now, with respect to a claim of insufficiency of the evidence, this Court has said in Sarastand that 2254d-1 is the appropriate analysis in that particular case. And when one looks at insufficiency of the evidence, one has to apply Jackson v. Virginia. Sotomayor, does Sarastand have the case with three concurrences? I do not. It's okay if you don't know that. I just wonder. In any event, the Court decided in that case that 2254d-1 is the method of analysis. In examining that, what this Court has to do is determine whether or not the Nevada Supreme Court correctly applied Jackson v. Virginia. That is the controlling law. And when one examines Jackson v. Virginia, the Court is not to consider issues of credibility, and it has to assume the jury resolved conflicts of evidence and credibility in the light most favorable to the prosecution. And the Federal District Court erred in granting Federal habeas relief on that claim because amongst the evidence that was found and recited by the Nevada Supreme Court, and it is, in fact, supported by the trial record, is the fact that the victim in the particular case was shown some pictures. This is not a, was this poor child sexually assaulted. The only issue in this case was who did it. And so the only issue that's presented is whether a jury could reasonably have found from the evidence presented, a rational jury could have found from the evidence presented, the elements of the offense. Scalia. The evidence presented at trial. At trial. That's exactly correct. I've got a question about this Mueller additional evidence that came in in the course of hearing the petition here. Tell me about that. Well, first of all, it shouldn't have been considered at all under a Jackson case, because Jackson itself is the controlling authority, and the United States Supreme Court says you consider the evidence at trial. This is not. What was the theory under which Judge Proh allowed it in? Beg your pardon? What was the theory under which Judge Proh allowed it in this case? Well, I'm not 100 percent sure, because Judge Proh recited, I think, three different ideas upon which he thought that it might be considered. The first one was, as he said, that it had some bearing actually on the issue in ground one. The issue somehow or another became transmogrified from a claim which it says, a claim of insufficiency of the evidence, to whether or not the evidence was somehow reliable. But if you look at the Jackson test, conflicts in the evidence, credibility, that's beyond the purview of the Court. So let me ask you this. This case in part deals with DNA evidence. Imagine a hypothetical case where a defendant is tried in state court, and under DNA 1.0, an expert gets on the stand and says the chances of this not being this defendant's bodily fluid are 6 billion to 1. Case gets tried, goes up to the Court of Appeals, the State Supreme Court habeas concord, and the case gets filed, and it's 10, 15 years later, and we now have DNA 6.5, and there's an expert that will say, not only was that expert wrong, but I've now had an opportunity to test the samples, and new DNA technology demonstrates to me that the defendant is excluded as a possible suspect in this case. Under your theory, would the district court be able to consider that? No. The district court would not. And as a matter of fact, that's where the Court erred in granting relief not only on this ground, but the claim that there's not even room for proof. Under your theory, there's no room for proof of actual innocence. Actual innocence. There's no freestanding claim of actual innocence, and in the absence of some violation of some constitutional right, no. That's the problem. But I assume that given the hypothetical that Judge Hawkins just mentioned, that there are other avenues, not in a petition such as the one that we have here, but there are separate avenues either directly to the State system on some sort of a post-conviction relief or a showing of actual innocence in a separate proceeding? Well, there's that possibility. There's the possibility of, you know, I guess commutation by the pardons board. That's not what my hypothetical is addressed at in any way. I just wanted to know if your theory that it's improper for a district court on habeas to consider evidence that was not presented at trial, even if there's been a dramatic change in scientific theory that addresses guilt or innocence, it can't be considered. And I understand your position. Yes. Jackson doesn't allow that. You cite Jackson, and you talk about the standard. Do you have Jackson there with you? Actually, I left it in the hotel. And then you've accurately framed one half of the test. I'd like to read you the second part after what the Supreme Court said should be done in 1979, and it says that the appellate court should not try to assess this evidence itself. And then it says, Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier effect could have found the essential elements of the crime beyond a reasonable doubt. That's correct, Your Honor. I recall that. Can you show me where in the Nevada Supreme Court opinion they parsed the elements of this crime? The – they did not parse the elements of the crime per se, but the point is that And if they didn't, doesn't that fly in the face of Jackson v. Virginia? No, it does not, because under the AEDPA standards and what the United States Supreme Court has said in Woodford v. Bisciotti and Bell v. Cone and Early v. Packer, that the courts, the state courts, don't even have to be aware of the Nevada – or excuse me, the controlling Supreme Court authority, so long as it's not an unreasonable application of that. And what the Nevada Supreme Court did is it went and recited certain aspects, specifically, that were supported by the record, specifically, that the victim was sexually assaulted in the early morning hours. The defendant was equated with the victim and her family. The victim – or excuse me, the defendant knew that the parents were not home. He knew that because the victim had called, trying to locate her mother, and he took the call, and the victim had said, you know, I don't know where my mom is, you know, and he went over to, I think it was CJ's, the bar. I think we're all familiar with the factual predicate. What my inquiry goes to is whether the Nevada Supreme Court went through the elements of this crime and, viewing the evidence in the light most favorable to the prosecution, analyzed or parsed those elements as Jackson seems to require. They recited the evidence that would show that the event had occurred and that the defendant had done it. Now, under Jackson, taking that and taking that alone, or however you view that, that's sufficient because it's not contrary to or an unreasonable application of clearly established Federal law. The Nevada Supreme Court doesn't have to go through, okay, sexual assault, upon a minor under the age of 14. She was under 14 years old. She was sexually assaulted, in this case, anally and vaginally, and it resulted in substantial bodily harm. The issue that was presented, you know, like I say, this is not a question of there isn't any dispute that this poor girl was sexually assaulted. The only issue was who did it, and the Nevada Supreme Court recited the evidence or at least some of the evidence that could, that showed that from that evidence a rational jury could have found that the defendant committed the crime. And, indeed, the Nevada Supreme Court did recite a lengthy, I think it went on for nine pages of facts, here's what happened. It went through a chronology of the events of that night. Additionally, the Court should note that in line also with the Jackson case, that the victim testified, and I direct the Court's attention to the excerpt of Record 210, she was shown some pictures, and she identified one of the pictures as her assailant. Now, the defense counsel tried to impeach that identification by bringing the sheriff's attorney deputy to show, okay, what were the, you know, exactly what was her response. But under Jackson, what this Court has to do is has to resolve conflicts and credibility in favor of the prosecution, or at most favorable to the prosecution. There was testimony of the defendant's brother. The defendant's brother is her assailant in a case where sibling relationships have much to do with the scientific evidence that was introduced. A brother who lived in the same trailer park. If the question is, is could the jury have found from the evidence presented in the light most favorable to the prosecution, not considering credibility, yes. The answer is, did this girl identify Troy Brown as her assailant? And the answer to that is yes. And while she may have been impeached, and while you or anybody in this room may think that that identification isn't sufficient, that's not for us to decide. The jury. The confusion with respect to the brother was brought out in trial, and it was the subject of impeachment and cross-examination. Yes, it was. And in fact, the jury, one of the interesting things about this is the jury got to see both the defendant, Troy Brown, and his brother because they testified. And so the jury could sit there and say, well, the one fellow seemed to have sandy hair, and he was balding, and compare. And there was testimony about how Troy Brown may have changed. There was an inference, at least, that he may have changed his appearance because he had darker hair at trial. That was noted. Right. But didn't the State admit that absent the DNA evidence that there was insufficient evidence? Well, there was somebody along the way that made that comment, but that's not binding either on this Court or us. But the State admitted that all this other stuff you're talking about, the weighing of this evidence in the first identification, second identification, all that other stuff, that without the DNA evidence, there was insufficient evidence. And that's what Judge Proe says in his order. Because you're saying, although I know the State admitted it, but now I'm disavowing that? Is that your point? I mean, even though it's the State. Well, we're not accepting that. This is a collateral attack. That was something that happened, which apparently wasn't accepted by the State court either when that person made that comment. I don't know how the State can admit that absent the DNA evidence there was insufficient evidence and then take it back. Well, first of all, we're the respondents in a habeas action, which is a collateral attack. That action that you were referring to was another action in State court. Does that somehow or another absolve the Court? Well, I mean, you're the State. You're the prosecutor. You're the government. I mean, you remember. No, we're not. We are the people that have the actual custody of Mr. Brown. And this is a collateral attack in federal habeas. Well, gee, really? I didn't know that. Maybe I should stop asking you questions and just decide this is a collateral attack in habeas, and therefore, you win. So, Your Honor, the fact that somebody makes that doesn't absolve. When the State makes an admission, we're not allowed to rely on it? Is it a – has it been a factual finding? No. There's been no factual finding? And even if the State were to have said – Sorry, sorry, sorry. I interrupted you. No, no. Go ahead. No, please. The point is, is even if that statement were made, and it was, it was made, that doesn't absolve the Court from deciding whether or not that's in fact the case. Sir, I was not suggesting that the Court needs to be absolved of anything or needs to – what I'm trying to do is narrow the scope of what issue we're really supposed to be looking at here. And if your – the premise of your argument is that we should be, you know, deferring to the juries, weighing of all the evidence, if the State has said nothing but the State's admission, then my question is, why are we looking at all the other things? And you just said now the State said that. I can't deny the record, but that's not the test. That's not the test. The test is Jackson v. Virginia. Right. Okay. Right. That's the test. We're not allowed to ask questions and get behind the tests and apply the test? Well, that's – where is that part of the test under Jackson v. Virginia? The whole rationale of Jackson v. Virginia. You read the whole paragraph in the whole case. It talks about leaving it to the jury to weigh the evidence and all of that. That's right. But if we're looking at a sufficiency of the evidence claim, really the evidence we're looking at now is the DNA evidence and the DNA expert. Well, really, because that's part of our argument. Part of our argument is that part of the aspect of this thing, this transmogrification, number one, isn't even actually exhausted. And part of the problem with this is that the Federal district judge, when he granted erroneously the motion to expand the record, decided to usurp, in effect, usurp the function of the jury in this particular case, and he fell into a trap, because now when he granted relief on the three claims of ineffective assistance of counsel, he has interjected into this thing hindsight which isn't appropriate. Are we still talking about sufficiency of the evidence, or are we talking about the ineffective assistance claim with respect to counsel's handling of the DNA issue? Well, we're – we've kind of gone over some of it. Kind of merged. Okay. They've kind of merged. But again, under 2254d2 now, the claims of ineffective assistance of counsel, you have to look at what evidence was presented at the State, in the State court. And the evidence that wasn't evidentiary hearing in this particular matter, it has to do with claims of ineffective assistance of counsel. Claims of ineffective assistance of counsel are examined at the time counsel made his choices, decisions, engaged in his conduct. Suppose that – suppose that the DNA expert in this case had falsified his credentials, and that was not known, obviously, either to the prosecution or the defense. And it turns out during the time the Federal habeas is pending that concrete proof, i.e., let's say a conviction of a crime of this expert, is available. Are you saying the district court couldn't expand the record to consider in habeas that a witness had falsified their credentials? Under 2254d2, consideration of a claim, and there – the Petitioner claims he exhausted this in State court. The Federal district court claims he exhausted the claim in State court. Under 2254d2, these claims are examined in light of the evidence presented in the State court. Now, what happened is, is when the judge granted the expansion of the record, he threw in this stuff in the claims of ineffective assistance of counsel. Sounds like your answer to my question is that would be okay. No, I'm not saying that's okay. No, no. Not what Judge Prod did. I'm asking if it would be – if the application of the rule you are advancing would prohibit a district judge from considering the fact that a DNA expert at the trial had falsified his credentials. Later learned. Later learned. Not without exhausting it previously. That's part of the problem. These claims, this evidence under – excuse me. Our time is running out. May I respond to the question? Certainly. Absolutely. The problem is, is that – and that's part of the problem with this. And he – part of this, he justified it. Is what you're saying that what – faced with this motion to expand the evidence, what Judge Pro should have done is saying you're raising a claim the Nevada courts have not had an opportunity to address. I'm going to send you – I'm going to stay and send you back to the Nevada courts to exhaust that claim. At the very least. And then we get into the Rhines questions and that sort of thing. Because – and part of this is the Petitioner has cited Vasquez v. Hillary for the exhaustion. We get to present bits and pieces. That's not correct anymore in my view under the Antiterrorism and Effective Death Penalty Act, Your Honor, because 2254d2 limits consideration of claims that are deemed exhausted to the evidence that's presented. Thank you. Thank you, counsel. Thank you. Your time has expired. We'll hear from the Respondent. The Petitioner. I'm sorry. The Petitioner. We've heard from the Respondent. Excuse me. Mr. Turner gets to go second. The appellee. This is an unusual sequence, counsel. Unusual and nerve-wracking. I see. All right. May it please the Court. My name is Paul Turner with the Federal Public Defender Office in Nevada. I'd like my main goal, as I said yesterday when I was here, is to answer the Court's questions. That's why I'm here. I would like to respond, if I could, to a number of things that I've heard recently. Well, I am troubled by the allowance of this post-trial, well, post-State process evidence in the Federal district court, the Mueller material and that sort of thing. Yes, Your Honor. What's your response to counsel on that? Your Honor, I think in a Jackson analysis, obviously part of the process is to understand and interpret the evidence that was presented to the jury. The evidence may not be clear on its face or it may be clear on its face, but there has to be some sort of interpretive process there. And all we presented in that report was information to help the Court understand what the evidence was that was presented. Obviously, if evidence is incomplete, if there's a gaping hole in the evidence, that certainly goes to its sufficiency. And in this case, as the Court has noted, the sibling aspect of this case is a critical component, and there was a gaping hole in this case. The State's expert, Ms. Romero, contemplated one brother in her calculations, which, as you see from the Mueller report, were actually the worst-case calculations for our client. But beyond that, she contemplated one brother. She was asked at trial, would a second brother be a factor in this thing, and she said no. And actually, there were four other brothers. And all of that changes the math. So there is an incompleteness in this testimony. And I think under Jackson, you're entitled to show that evidence is incomplete. And that's what must be the case here. One of the problems there is that there are other brothers, but the only one brother could potentially have been a possibility or a possible target here. All the others either lived away or were clearly beyond this issue. Actually, Your Honor, Travis, Trent is the brother who was identified by the assailant by the victim at one point, at least partially identified. Travis, the third brother, was the roommate of Troy Brown. So he was very much in this picture. And this is an extremely small town. The distances are, as I think the record will show, are very small here. Travis was in the town that night. So there were two other brothers in the same little, small town that night, both of whom were intimately, geographically close to this whole scene. The other two brothers were in Utah, but Utah is not too far away. But was there any suspicion directed toward Travis? There clearly was toward Trent. I understand that. But was it ever suggested that Travis was the perpetrator? I'm not sure if the police reports ever suggest that. I think they should have been, if you want to be blunt about it. I think there should have been directed at every one of the brothers there and as Mr. Henley and other possible suspects. Did the DNA expert that testified at the State trial focus exclusively on your client? On our client? Yes, sir. In terms of expressing to the jury the factual probabilities that he was not the donor  With one exception, Your Honor. She did offer a calculation to consider one brother, so two brothers. She offered a calculation and came up with a 1 in 6,500 figure. That's totally inaccurate and totally wrong, and it also doesn't consider that there was a third brother, as I indicated, in town that night, and that there were other brothers. But she was asked if another brother would have meant anything, and she said, no, it didn't mean anything.  It's mathematically wrong. It's false. So her analysis was grossly inadequate and incomplete. At worst, it would only be 1 out of 256. Isn't that right? Well, I think if you consider all the parameters here, you actually get down to numbers lowest 1 in 64, because Is that in evidence anywhere? That's in Dr. Mueller's report, because, and I'm far from being an expert on this, but you have, as the Court probably knows better now, you have the homozygote and heterozygote factor. You have all kinds of combinations here, and you should consider all of them. This evidence was presented from the State's best case, our worst case. So it was incomplete in that regard, too. If you ever considered the full picture. Was Ms. Romero, the expert that testified at trial, was she asked whether the evidence could exclude the other brothers? I don't believe she was, Your Honor, but I could be wrong about that. I don't recall that question. Was she asked anything about that? I don't believe she was. I may be wrong, but I don't believe she was asked. Was she asked whether either of the brothers in the other two brothers in the area could have been the donor of the bodily fluid she examined? My recollection, Your Honor, is that when the question was asked by defense counsel, should you consider a second brother, and he obviously meant Travis, but she said no, and he left it. He just walked away from it. Was there anything prohibiting trial defense counsel from asking those questions? No. No. Except I put submit, and we have an ineffective assistance claim, obviously. That bears on that? I think it interrelates with that. I don't think he understood the math. I think he – I don't think he appreciated what the case was about from a mathematical perspective. I think that's the duty of a lawyer in a first-degree murder case, to know the law and to know the math of the DNA that was involved. But specifically, is one of your IAC claims based on a failure to cross-examine Ms. Romero in the way I've just suggested? Failure to confront her on the math side. That – I would like to mention – I want to ask you a question about this. I was trying to get an answer from the opposing counsel, but he wouldn't answer me, so I'll ask you. The judge pro said, taking into account the State's own admission that absent the DNA evidence there was sufficient evidence to convict Petitioner, the State court's factual determinations are called into question. So when he makes that reference to the State's own admission, he drops a footnote. I don't know if he's referring to a particular exhibit, but where did he get that notion? Yes, Your Honor. I'd like to – I'd love to address that. Okay. And please interrupt me if I'm not addressing it clearly. The State conceded this twice. In my brief, I mentioned one of them. I honestly didn't know about the second until I was on an airplane coming here, and I found the second one. The first place they conceded is at EOR 759. It's volume 4 of the EORs. At lines 21 through 25, they say what we say in our brief. They flat out say that without the DNA, they could not convict this man. That's in an answer followed by the – assigned by the prosecutor himself. This is not some casual person. This is the prosecutor of that case in State post-conviction. At the hearing in State post-conviction, this is what I missed. I missed it completely until a few days ago. What was the first site? It's EOR 759, Your Honor, and it's lines 21 through 25. It's the bottom of the page, volume 4 of the EORs. In the errata EOR, the State filed an errata EOR and a second errata EOR, and the errata EOR, it's the transcript of the post-conviction hearing in State court. On page 65 of that document, and its internal page, it's actually page 256 of the transcript, and these are these little things. If anybody's having as tough time as I have, these are very hard to read. Yes, I know. I was able to read them. On page 256, it's actually errata EOR 65. This is the prosecutor. And he's responding to the Henley situation. So he is trying to help his side of the case. He's not just making a casual comment. He says, he's talking about Mr. Lockheed, the defense lawyer. He created a reasonable doubt. And everybody concedes, everybody, I think, concedes that but for the DNA, there was reasonable doubt. That is the prosecutor stating that. And he is getting an advantage from that. He is seeking to win State post-conviction, which he does. So the State of Nevada has obtained a legal advantage on that basis. And I would submit to you that's a concession that's binding in any court in America. What happened after that? Was there a further appellate review with respect to that particular proceeding? There was, Your Honor. It was affirmed in a, as I recall, a relatively short time. Was there any reference in the affirmance to this admission? That's an excellent question, Your Honor. And I apologize. I do not recall if there was. Was it Supreme Court? Supreme Court of Nevada? Yes. I tend to think there wasn't because I would like to think I would have, well, there could have been to the reference in the answer. I don't recall that there actually was. I'm certain it wasn't to the transcript because I actually, I had looked at that transcript and I thought I looked at it diligently, but I had frankly just missed that. And I would have let the Court know that it's twice. It's not once. It's twice. That was his closing argument in post-conviction. I'd like to mention one thing before I get on to another subject or any subject the Court would like to know, is that the State indicated this morning that I think they were saying the Nevada Supreme Court somehow found there was an identification by the victim of my client, that the Nevada Supreme Court opinion at page 242, actually it's page 285 of the Pacific Second Cite, says, while Jane Doe could not identify her assailant. That's flat out in the opinion. So there was no identification of Mr. Brown at all. The only identification was through the defective, false, incomplete DNA. And this man has been in prison a long time on something that's just wrong, flat out wrong. And what precisely is your argument with respect to the DNA? The fact that the figure 1 out of 6,500 was used when it really should have been 1 out of 256? Is that what you're saying? Is that the essence of it? That's part of it, Your Honor, and I think that's very important. Another very important part is the fact that the witness, and I think if you read it, I'm sure Your Honors have read it, I think you can almost sense that the lady was really struggling and didn't want to do this, but the prosecutor got her to say that there was a 99 point whatever, 999 percent probability that this man was guilty, not of a random. Well, that's the prosecutor's error. Right. We're familiar with that syndrome. That is just wrong. And you know it's wrong. We all know it's wrong. And that – and in closing, he tells the jury that, 99 percent, that this man is guilty. And this is a jury of normal people who are presumably not math experts, and they actually probably believe that. And that's why this man got convicted. And he could not have been convicted without that kind of evidence. That's wrong. Did you make that argument before the jury? No, I didn't. Did I make the argument before the jury? Well, whoever tried the case was – was – No. There was no – the defense attorney did not, to my knowledge, and I hate to say something when I could be wrong. I don't recall him refuting that. I don't recall that he made any refutation of that. Was that deficient in 1994 with the state of DNA evidence? Yes, it was. The Shishilli case that this Court handed down was two months before this trial. This trial was in September of 94. That was in June. And there were math – and we cited to some of them – there were treatises out there that made it very – well, very clear that the prosecutor's fallacy was just wrong. That was clear. And it was also clear, I think – and I think there are treatises that are cited in our materials that would indicate that the sibling situation was somewhat clear, too. It may not have been as clear as the other. The other was crystal clear. But I think that it was clear that this was an area of great, great concern, these probability numbers. And courts were looking at them. And I think it was clear that siblings were a major factor and that the math part of it was very important to it. Judge Hawkins asked about the elements of crime. The Jackson analysis is nonexistent. There's no review of the elements of the crime in this opinion I'm looking at. And in the Sarazade case, which just came down, of course, a couple of months ago, well, I guess in March, this Court made it crystal clear and it cited the Shine v. Shumsky case that this Court – Crystal clear in a three-way decision. I'm sorry. No. Which opinion was crystal clear? I guess when it goes to help me, I find it clear. Otherwise, very murky. But the Shine case, when you look at that and you'll see that this is page after page of analysis to do a legitimate Jackson, you've got to look at the elements of the crime. It just isn't here. This is not a Jackson analysis. Okay. Let me just go back to the DNA for just a moment. What is the prejudice that you're suggesting because of the differentials in the DNA numbers? I think two things, Your Honor. I think if the jury had known that it was at least as likely that it could have been two other brothers, possibly even more, but at least two. Well, you say at least as likely. Now, you're dealing with numbers of 1 out of 10,000, 1 out of 1,300, 1 out of 256. They're all adverse probabilities. You might be slightly increasing the odds every time there's a new number thrown out, but there was never a showing, was there, that the suspicion really pointed in another direction? Well, I believe there could have been, Your Honor, properly the evidence had been properly presented because I think the numbers would be comparable for any of the brothers up to at least, I think Dr. Mueller was talking about five loci, I believe, that the numbers could get as low. I know in his analysis they got as low as 1 in 64, and that's a dramatic difference between that and 1 in 6,500. And, of course, we're talking only about reasonable doubt. I mean, I say only. It's the critical element of any criminal trial. Reasonable doubt is what we're saying. I'm saying to the Court that there would have been reasonable doubt, one, if you had the proper sibling evidence before the Court, two, if that 99 percent thing is gone. Get that out of here. I think that may have had a dramatic impact on a juror who is – who actually would believe that, gee, these folks are experts. They must be right. I mean, that would impress me, I would say. Is there a prosecutor's folly case that holds that it is reversible error to allow that statement? Or that kind of statement? Your Honor, you know, I don't know one off the top of my head. There may well be one. As I recall in Shishilly, it was just a one factor of a number of factors. I can't remember all the details of that. Let's see. Unless the Court has further questions, I don't believe there are further questions. I think the only thing I would want to add is that we – I think the Court could affirm, obviously on any of the grounds here, I think Judge Shapro was right on target. I think he saw this case for what it is. I think – I think the Jackson claim is clearly – I think it – I think it should be affirmed on that basis. I think this lawyer was obviously ineffective. There's no doubt about that. DNA involves more than just the lab protocols and things of that nature. DNA involves a lot of math, and that's a big part of DNA, and this lawyer didn't appreciate that. Therefore, his client got convicted, and he shouldn't have been. And our client's entitled to a new trial. We asked this Court earlier in the year to release our client pending appeal, and I know that did not happen. And I don't have a motion currently pending, but I – but I – maybe I'd orally want to say that we believe whatever happens, if we're – if we're fortunate enough to have an affirmance that our client should be released while any other litigation goes on. And that's being presumptuous on my part, but if that should happen, I just wanted the Court to know that that's a real important factor to us. Thank you. Well, this is very unusual. I don't think I've been presented with that kind of request before. What would the theory be on a habeas petition? We're not dealing with a direct criminal appeal, in which case under Rule 9 we could send it back to the district judge to make a determination. What would the theory be that we would release at this point? I can't. Even if we were to affirm, even if it's simply affirmed here, what would the theory be under which we would release? We would originally – there are rules, and I hate to say I didn't come prepared to quote the rule, but I mean, this Court has, obviously, the power to release people, at least pending appeal. Yeah, but don't forget, our orders are orders to the State authorities to release. Can a Federal judge order the release on his own motion? I believe, if we properly ask for that relief, of course, we originally asked the district judge. He had turned us down. And then we came to the Court. We came here on a direct motion. Did you come on an emergency motion? Yes, we did. It's the motions panel, and they turned it down. Yes, we did. Yes, we did. Actually, I think, Judge Scanlon, I believe you were one of the two people that turned us down, actually. I don't know if you recall that. But, I mean, and, you know, I understand. They typically are. I just wanted to let you all know that this is important. But this would be at a stage where, again, we're all doing some hypothetical presumptions here, that we were to affirm. Your point is that if we are to affirm, Judge Pro, that we should order the State to release this individual pending retrial? Well, or, Your Honor, and this would be certainly an acceptable alternative. We're fortunate enough to be in that position that you would remand that to Judge Pro to make his own decision whether he should be released. Either way would be fine with us. We're sure we're going to be treated fairly. But we just wanted, we want this man out. If we get an affirmance, we want this man out of prison right now. We don't want him still in there. Well, suppose the State decides it wants to retry this man. Well, then that's a privilege the State will have to deal with. And if they do that and we end up back in State court, we'll have to deal with it. But pending, pending the possibility of a petition for rehearing, I'm just, you know, I'm just hypothetically talking here. And don't let me, don't, don't any of you think I think I've won this case. Believe me. But I'm just talking hypothetically that, you know, if I'm lucky or we're lucky, we have a petition for a hearing, we have cert, whatever. And a lot of time goes by. My client's still in prison. I don't want that. I don't want to be the one who allowed that to happen. Thank you, counsel. The case just argued will be submitted for decision and the Court will adjourn.
judges: O'scannlain, Hawkins, Wardlaw